(15 Misc. Rep. 227.)

PEOPLE ex rel. RAMSDELL et al. v. JEWETT et al.

(Superior Court of Buffalo, General Term. December 23, 1895.)

1. POLICE—RESERVE FORCE.
   A city charter providing that the board of police shall divide the patrolmen into three platoons; that no two of the platoons shall be on duty at the same time, nor shall they wear uniforms when not on actual patrol duty, except when, in the discretion of the board, public demands are such as to require the aid and assistance of a second platoon,—does not prevent the board from requiring that patrolmen belonging to one or the other of the platoons not on active duty shall remain at the station house as a reserve, subject to call in case of necessity; the word "duty," in the charter, referring only to active duty.

2. SAME—DISCRETION OF POLICE BOARD.
   Under a city charter providing that no two platoons of patrolmen shall be on duty at the same time, except when, in the discretion of the police board, public demands require the aid of a second platoon, or the board may, in its discretion, on such occasions, order on duty all three platoons, the discretion of the board is not subject to review by the courts.

Certiorari, on the relation of Norman Ramsdell and others, to review proceedings by Edgar B. Jewett and others, composing the board of police of the Buffalo department of police. Writ dismissed.

Argued before TITUS, C. J., and WHITE and HATCH, JJ.

John Cunneen and Charles J. Oishei, for relators.

A. H. Jackson, for defendants.

WHITE, J. The relators are patrolmen on the police force of the city of Buffalo. The city charter creates a department of police, and provides that there shall not be less than 11, nor more than 14, police precincts; that the common council shall fix and determine the number of patrolmen in the police force; that there shall be a board of police, which shall consist of the mayor, ex officio, who shall be the president of the board, and two commissioners; that the board shall designate the number of patrolmen to be assigned to each precinct. The provision of the charter over which this controversy arises is as follows:

"The board [i. e. the defendants] shall designate the number of patrolmen to be assigned to each of said precincts and shall divide said number of patrolmen into three platoons; no two of said platoons to be on duty at one and the same time, nor shall they wear uniforms when not on actual patrol duty, except when in the discretion of the board public demands are such as to require the aid and assistance of a second platoon, or the board may in its discretion on such occasions order on duty all of said three platoons. * * *"

On July 5, 1895, the defendants, by preambles and resolutions, made a determination, order, or provision that thereafter a certain

number of the members of one or both of the platoons not on active duty should constitute a reserve; that the men in reserve should remain at the station house, subject to call for active duty in case of, emergency, during short periods of time, when a platoon other than the one to which they belonged was on active duty. In other words, the defendants decided and determined that certain patrolmen, who were not members of the platoon on active duty, should hold themselves in readiness to respond to a call to active duty in case of an emergency at one and the same time that a platoon of which they were not members was engaged in active duty. The men so in reserve were not required to wear their uniforms, nor to observe any particular line of conduct, except to be at the station house, and to respond if an emergency made their services necessary. This arrangement of July 5th was immediately put into practice by the defendants, and that is what the relators complain of. As matter of fact, the hours of active duty are less under this new arrangement than they were under the one in force prior to its adoption. The aggregate of time spent by all the members of any platoon in active duty and in reserve slightly exceeds 8 hours out of the 24 for each member of the platoon. The claim of the relators is that the holding of a member of any platoon in reserve at the station house, while a platoon other than the one to which he belongs is on active duty, is a violation of the statute, in that it requires members of two platoons to be on duty at one and the same time. They claim, further, that the "occasions" mentioned in the statute when the defendants are authorized to order on duty, at one and the same time, members of different platoons, are times only when there is riot, tumult, disorder, a large fire, or an extreme breach of the peace, within the city. They also claim that when the new arrangement was made by the defendants there was not sufficient evidence of its necessity, or that one platoon on active duty was not adequate for the proper police protection of the city.

The facts of the case touching the necessity of the action taken by the defendants which it is sought to annul, according to the record as it is made up, are about as follows: There was no riot, tumult, large fire, or extreme breach of the peace. There was more or less disorder, but it may be assumed that it was not greater than usually prevails in the city of Buffalo. The language of the provision of the charter with which we are dealing is not such as we should expect from one skilled in the drafting of statutes, but its real meaning may be determined, I think, with less difficulty than is frequently met with by courts in similar cases. We may broadly assume, for the purposes of this proceeding, that when the statute in question says, "No two platoons to be on duty at one and the same time," it means simply that no member of one platoon shall be required to do duty with another platoon, on the theory that the greater number, or the whole platoon, includes the lesser number, or some part of the platoon; that, when the statute says that "platoons shall not wear uniforms when not on active duty except when in the discretion of the board public demands are such as require the aid and assistance of a second platoon," it means simply that no patrolman shall wear his

uniform when not on actual, active duty; and when the statute says the board may, in its discretion, on such occasions, order on duty all three platoons, it means simply that they may order on duty any part of said three platoons. Such is evidently the meaning of the law. Now, a careful comparison of the statute with the record before us, and the determination sought to be annulled, makes it plain (1) that the defendants designated the number of patrolmen to be assigned to each police precinct; (2) that the defendants divided the patrolmen in each precinct into three platoons; (3) that no patrolman is required to wear his uniform except when he is on actual, active duty; (4) that no member of either of the three platoons is required to perform active patrol duty at the same time that a platoon other than that of which he is a member is performing active patrol duty. If the word "duty," as used in the statute, means actual, active, patrol duty, as I think it does, then the defendants must succeed in this controversy, because they have not violated the law, but have complied with all of its requirements. The "duty" of the relators, within the meaning of the charter, is measured by the service which they are obligated to perform as patrolmen. The word, as used in the charter, has no reference or relation to their conduct in religion, morals, or ethics. The duty of the relators to respond to a call for service within the line of their vocation, in case of an emergency, is the same whether they be at the station house or in their own homes, or whether they be in uniform or not, when the call is made. In either case it is their "duty" to respond, and perform in a proper manner the necessary service, and it is only while they are performing such service that they are on "duty," within the meaning of the charter. My conclusion upon this point, therefore, is that the word "duty," as used in the charter, means actual and active duty, as distinguished from being kept in reserve or within call for such actual and active duty. The fact that the defendants use the expression "reserve duty" does not imply that they give to the word a definition different from what I consider the correct one; and, even if it did, it would not prove the fact to be as it may be claimed by the relators their language indicates. The relators, when held in reserve, are not on duty, therefore, within the meaning of the charter, but they are thus kept in reserve to be placed on duty if an emergency shall make it necessary; and, in the absence of any emergency during the time they are held in reserve, they are set at liberty from the restraint which has been put upon their movements, without having performed a moment of such active duty as by the charter they are required to perform as patrolmen. In my opinion, there is no conflict between the charter and the determination of the defendants sought to be annulled.

For the purpose, however, of further considering the matter in hand, we will assume, for the sake of the argument made by the relators, that the relators are doing "duty," within the meaning of the charter, when they are held in reserve. Then, as members of different platoons are on duty at one and the same time, the question arises, in what manner and by whom is it to be determined whether or not public demands are such as to require such service? I can

find no basis for the claim made by the relators in this behalf; that is to say, that such service can be required only in cases of riot, tumult, etc. The charter, as we have construed it for the purpose of this proceeding, is given its broadest possible meaning, and is, in effect, that, on occasions when public demands require it, such service may be exacted of the relators. The words "public demands" and "occasions" refer to and identify the same thing or subject-matter, namely, a necessity for having members of different platoons on duty at one and the same time. The very nature of the case makes it clear to me that the defendants, in administrating the affairs of their department, must necessarily act, for the most part, upon apprehensions of danger to the community which may or may not prove to have been well founded. They must necessarily heed and act upon rumors, news items in the daily press, and other publications, confidential communications, surmises, or guesses,—if you please so to designate them,—and information, of a more or less reliable nature, derived from countless sources, as well as upon their own personal knowledge concerning the matters with which they have to deal. In such a condition of things, it is easy to see that an emergency may arise at any moment requiring members of different platoons to be on duty at one and the same time, when to prove the fact that the emergency exists, by such evidence as would be received by a court of justice trying a controverted question of fact, would be an absolute impossibility. For this reason alone, as it seems to me, it must be held that the defendants are vested with the discretionary power to determine and decide for themselves when, in the language of the charter, "public demands are such as require that members of different platoons shall be on duty at one and the same time." To hold that the relators are entitled to litigate with their superior officers the question as to whether or not public demands require the services of more or less of the members of the three platoons of patrolmen in a precinct at one and the same time, would be subversive of all discipline, and of that wholesome respect for constituted authority so essential to the efficiency of the police force of a great city. The case of In re Fitch, 147 N. Y. 337, 41 N. E. 699, relied upon by the relators as authority for the contention that the writ of certiorari will lie in such a case as the one at bar, does not, in my opinion, support the contention. That and many other cases hold—and in fact the rule is elementary—that where, as in that case, a board or officer exercises judicial functions, and no other adequate remedy is available to correct errors made by it or him, the aggrieved party may prosecute the writ of certiorari; but that and all other cases to which my attention has been called, where the writ was upheld, were clearly distinguishable from the one at bar, in that the determinations reviewed were based on evidence which was certain and definite, and could be intelligently weighed and considered by a court on a review of the matter, whereas, in the case at bar, the evidence upon which the defendants made the determination complained of may or may not have been of that character; and, even if it were of that character in the particular instance under consideration, action by them on the same line while exercising their functions

as a board of police must frequently, and probably will, be based on facts satisfactory to them, but which, if submitted to a court in a subsequent controversy as to the fact whether public demands were of a specified nature on a certain date in the past, would seem puerile and foolish. My conclusion is that the writ should be dismissed, with costs. All concur.